19395

CAROLINA POWER & LIGHT COMPANY, Appellant-Respondent, v. Frank P. COPELAND, Jr., and The Federal Land Bank of Columbia of whom the first named is, Respondent-Appellant.

(188 S. E. (2d) 188)

*Messrs. James P. Mozingo,* III, *Baker & Etheridge,* and *Paulling & James,* of Darlington, *for Appellant-Respondent,*

*Messrs. Greer & Chandler,* of Darlington, and *Saleeby, Saleeby & Herring,* of Hartsville, *for Respondent-Appellant,*

*Messrs. James P. Mozingo, III, Baker & Ethridge,* and *Paulling & James,* of Darlington, *for Appellant-Respondent,*

March 28, 1972.

LITTLEJOHN, Justice.

On October 18, 1968, Carolina Power & Light Company, as condemnor, brought this proceeding to acquire a right-of-way across a 172 acre tract of woodland in Darlington County owned by Frank P. Copeland, Jr., landowner. The easement required was for the purpose of constructing and maintaining electric power lines. The right-of-way ran a distance of approximately 2157 feet, and varied in width from 145 to 160 feet, occupying approximately eight acres. The rights condemned included the privilege of cutting trees outside the right-of-way strip in what is referred to as the "fall area." The land is presently, and has been, for the most part, planted in pine trees. It is located about three miles north of the city limits of Hartsville.

The only issue for determination by the court below was the amount to be paid by the condemnor to the landowner as just compensation for the property rights acquired as contemplated by Article I, Section 17 of the Constitution of South Carolina. After a trial before a clerk of court's jury, a trial *de novo* was held before a judge and jury in the Court of Common Pleas in March 1971. That trial, from which this appeal arises, resulted in a verdict of $38,000 in favor of the landowner. The condemnor moved for a new trial on several grounds. The judge overruled the motion on all grounds except that ground which challenged the verdict as being excessive. He found the verdict to be excessive, and granted a new trial unless the landowner agreed to reduce the verdict to $25,000. The landowner agreed.

After the verdict was returned the judge considered the question of interest and ordered that the condemnor pay interest to the landowner "at the legal rate" from "the date that the judgment on the verdict is entered" until the time that the judgment is paid.

The condemnor has appealed, challenging: (1) rulings of the judge relative to admissibility of evidence; (2) the judge's refusal to hold that the verdict was the result of caprice, passion and prejudice, and (3) the allowance of interest.

The landowner has appealed, challenging the judge's refusal to order payment of interest on the verdict from the date the land was first required on October 18, 1968, until the date the verdict is paid.

Prior to this proceeding the condemnor already owned a right-of-way across this 172 acre tract. The new right-of-way parallels the old right-of-way for approximately 400 feet and then angles somewhat westerly so as to leave between the two rights-of-way a triangular parcel of land containing approximately 14 acres.

In the court below it was the contention of the landowner that damages should be paid for: (1) taking the easement

over the eight acre tract; (2) taking the right to cut trees which might endanger the power lines in the "fall area" (about three acres), and (3) diminution in value of the 14 acre triangular tract between the two power lines. It was the contention of the landowner that none of the remainder of the 172 acre tract was damaged. As moving party in the trial, the landowner prepared and presented his case along these lines. Evidence was presented relative to these three elements.

The condemnor presented its side of the case by submitting evidence of the value of the property taken for an easement, and evidence of the diminution in value of the remainder of the entire tract.

The land owner submitted two expert witnesses who testified that the highest and best use of the land taken and/or damaged (a total of approximately 25 acres) was as rural residential subdivision property. They testified that the land was worth from $2500 to $3000 per acre prior to the condemnation; they testified that the 25 acres were worth approximately $100 per acre after the condemnation.

The condemnor's expert witnesses testified that the highest and best use of the property was its present use, growing pine trees. They placed a value of from $250 to $275 per acre on the entire tract. They asserted that the acreage within the right-of-way was reduced in value by 100%, while the acreage in the "fall area" was reduced by 25% to 50%. It was their opinion that there was little or no damage to the remainder of the tract.

The condemnor's chief contention is that the trial judge erroneously permitted the landowner's witnesses to give testimony based upon improper considerations. These witnesses, condemnor contends, based their testimony on a theory of valuation which presupposed subdivision of the 25-acre tract and the sale of residential lots therefrom.

The heart of the question is whether the landowner's witnesses blended into their appraisals not only fair mar-

ket value, but also, profits which might be brought into being by promotion and development of a rural residential subdivision.

The measure of just compensation in cases such as this is the value of the land required plus the amount of any "special damage." *South Carolina Power Co. v. Baker,* 212 S. C. 358, 46 S. E. (2d) 278 (1948); Code of Laws of South Carolina (1962), §§ 24-12, 58-302, 58-779.

While the landowner is entitled to compensation based upon the most advantageous use to which the land might be put, still, it cannot be presupposed that the land has already been put to such use. A careful reading of the record in this case strongly indicates that the landowner's witnesses' appraisals were not based entirely upon their estimation of the fair market value of the condemned property as it existed on the date of entry by the condemnor. Their appraisals appear to be inflated by speculation as to profits that might be realized by a developer who might subdivide and improve the property.

McCuen Morrell, one of the landowner's witnesses, testified in part as follows:

"Q. And at that time you reached that valuation based on a per lot basis, did you not?

"A. In my mind, I cannot put it out of my mind what I can do with something and the potential it has. I can't put it out of my mind. I have to have something in my mind of what I can take acres and . . .

"Q. And when you were talking about twenty-five hundred to three thousand dollars an acre, you were talking about what you could do with it after you develop it?

"A. It has the potential for that.

"Q. Would you pay him twenty-five hundred to three thousand dollars an acre to subdivide it?

"A. No, sir, but if he will turn it over to me and let me subdivide it for him, I will get him more than that for it.

"Q. After you put in the lots?

"A. Yes, sir.

"Q. And after you put in streets and after you put in water and sewage if necessary?

"A. (Witness nods)."

[Counsel]: He is just moving his head; the jury can't hear him.

"A. I wouldn't be putting in water and sewers, but I would be subdividing it."

By the Court:

"Q. Is that the basis you feel you could get twenty-five hundred to three thousand dollars an acre?

"A. It has that potential, Judge.

"Q. What I am interested in and what I think the jury would like to know. What was the fair market value of that property in its raw condition, undeveloped, without any plats or lots in October of 1968. If a person who simply wanted to buy a tract of land; this has got 172 acres but going on the basis you say he took the southern part with 40 acres in it, what would it be worth on an acreage basis? If a man wanted to buy land without going into any effort to subdivide or do anything else.

"A. It would depend entirely on what he was going to do with it.

"The Court: All right. I don't think this gentleman knows what the fair market value was."

Roy Peavey, also a witness for the landowner, testified in part as follows:

"Q. Mr. Peavey, you are aware that you are valuing this property as of October 1968, are you not?

"A. Yes, sir.

"Q. In October 1968, would you have paid twenty-five hundred dollars an acre for it?

"A. I wasn't buying land, no, I wouldn't buy it.

"Q. You wouldn't buy it today for twenty-five hundred dollars?

"A. That is not my business. I don't buy it.

"Q. And what did you consider it as individual lots for rural homesites?

"A. I might say that we have handled property in this . . .

"Q. Let me ask you. I asked you a question. Did you consider it as rural homesites by lots in coming to this twenty-five hundred dollars an acre?

"A. Ultimately you have got to consider that because of its highest potential use.

"Q. And, of course, your highest potential use was as rural homesites?

"A. Correct.

"Q. And you put your evaluation on the property based on the fact of reducing it to rural homesite lots, did you not?

"A. Right."

Appropriate motions were made to strike the testimony of the landowner's witnesses on the grounds that their testimony was too speculative and conjectural. These motions were ultimately denied, although it is clear that at one point the judge concluded that their testimony was inadmissible:

"The Court: . . . [I] do feel strongly that the testimony of both your witnesses is based on a per lot valuation, and therefore is not admissible and not a proper basis for the determination of just compensation."

It is not unusual in the trial of condemnation cases for judges to be plagued with the duty of distinguishing reasonable fair market value of property taken, on the one hand, from profits which might be earned by skillful development and improvement of the property taken, on the other hand. The problem arises both in ruling upon admissibility of evidence and in the charge of the law to the jury. A landowner is entitled to just compensation for the property taken as of the date of the condemnation. Obviously, the potential which a parcel of land has for bringing about profits from skillful use and businesslike development

is one of the factors which determines market value. Accordingly, it is always appropriate for witnesses to testify concerning the potential highest and best use of property taken. At the same time, the court should not allow evidence which permits a jury to conclude that the condemnor must pay or replace profits which might have accrued by the use of property should such not have been prevented by the condemnation. The potential of property may be considered as an element affecting value, but it is not sufficient to show that the potential is a mere possibility. It must be shown that the potential is reasonably probable.

"Present, prospective, or available uses.

"It is a well-established principle that the tribunal whose duty is to determine the value of land taken by eminent domain is not limited to the value of the land for the purposes for which it is actually used, but may consider all uses to which it is adapted and might be put, and will award compensation upon the basis of its most advantageous and valuable use, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future. The owner may show any uses, present or future, which are sufficiently practicable and probable as to be likely to influence the price which a present purchaser would give for the property. In other words, the owner is to be given, by way of compensation for his land, its fair price for any use for which it has a commercial value of its own in the immediate present or in reasonable anticipation in the near future. . . .

"The uses which may be considered must be so reasonably probable as to have an effect on the present market value of the land; a purely imaginative or speculative value cannot be considered. There must be a possibility considerable enough to be a practical consideration and actually to influence prices. For example, although, when a tract taken by eminent domain is used as a farm, the owner is entitled to have its possible value for building purposes considered, the jury

or other tribunal is not permitted to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot. The fair market value of undeveloped land immediately before condemnation is not a speculative value based on an imaginary subdivision and sales in lots to many purchasers; it is the fair market value of the land as a whole in its then state according to the purpose or purposes to which it is best adapted and in accordance with its best and highest capabilities, and it is not proper for a jury to consider an undeveloped tract of land as though a subdivision thereon is an accomplished fact. . . . " 27 Am. Jur. (2d), Eminent Domain § 280 (1966).

■ Where the highest and best use of land is for development as a real estate subdivision it is proper to ask an expert witness what price a developer of real estate subdivisions would pay, as of the date of the taking, for the property to be developed into a subdivision.

Witness Morrell admitted that he would not ask a developer the price he testified to as being the fair market value:

"Q. If you were selling it to a prospect who wanted to go in there and build roads and streets and put in waterlines and so forth, you would ask him for twenty-five hundred to three thousand dollars an acre in its condition in October, 1968? Is that what you mean by that evaluation?

"A. I can't say that I would ask him that. But I would say that is what I could do with it. That is the potential that he has."

■ It is not proper to ask a witness what amount the developer could expect to receive for the lots sold to prospective homeowners. The price which can be obtained  from the sale of lots in a subdivision, and the profits realized, become understandably speculative when one realizes that the costs of such things as surveys, cutting of streets, providing of utilities, curbs and gutters, advertis-

ing and sales commissions must be offset against the total price received for the several lots.

A fair analysis of the whole of the landowner's witnesses forces the conclusion that the appraisals included at least some profits which might be experienced from developing the condemned property into a rural residential subdivision.

The gravamen of the testimony of the landowner's witnesses is that the value testified to or a little more could be realized after development of the property into rural residential homesites. It was not to say that a developer would pay that amount and then expect to get his profits over and above the price paid.

The witnesses skillfully attempted to stay out of the profit and speculation area, but, we think, failed.

The condemnor contends that all evidence treating this property as having residential subdivision potential for valuation purposes should have been excluded under the rule set out in *South Carolina State Highway Department v. Westboro Weaving Company,* 244 S. C. 516, 137 S. E. (2d) 776 (1964). We think the facts here are more like those in *South Carolina State Highway Department v. Bryant,* 253 S. C. 400, 171 S. E. (2d) 349 (1969). The evidence makes at least a jury issue under the rationale of this case. We find no error in permitting the witnesses to tesify that the highest and best use of this property was for a residential subdivision even though present plans for such use were shown.

The approved formula for determining damages in condemnation cases in this state provides for payment to landowner of fair market price of property taken, plus payment for diminution in value caused to *the remainder* of the landowner's property. If that formula is unfair to either party some other formula may be used. For example, if church property is involved, another formula would be required because there is no fair market value for church property.

Here, the landowner, instead of using the usual approach to the measure of damages and evaluating the remainder, has singled out a particular area, involving about 25 acres, of the 172 acre tract. No necessity for such an approach to the damages appears in the record. Even assuming, without so deciding, that the landowner's approach might bring about a fair result, we agree with the trial judge when he at one point in the proceedings said: "That is simply not the proper way for an appraiser to testify in a case like this for the jury to understand values." We think there are two cogent reasons why the approach of the landowner to the value must be disapproved: first, the condemnor had no way of knowing that the landowner's appraisal would involve this particular 25 acres only, and accordingly, the condemnor did not have that particular parcel appraised, secondly, when different formulas are used it makes the work of the jury difficult, if not impossible.

For the reasons above stated, a new trial is granted.

Inasmuch as the question of interest will likely arise again after a new trial we proceed to dispose of the issue. The landowner contends for interest from the date of the initial taking, October 18, 1968, until date of payment. The judge allowed interest from the date of entry of judgment until paid. The condemnor contends that no interest whatsoever should be paid. By appropriate exceptions, both parties have appealed, submitting their respective contentions to this Court.

The condemnor relies primarily on three cases: *South Carolina State Highway Department v. Southern Railway Company*, 239 S. C. 1, 121 S. E. (2d) 236 (1961); *South Carolina State Highway Department v. Schrimpf*, 242 S. C. 357, 131 S. E. (2d) 44 (1963); and *South Carolina State Highway Department v. Sharpe*, 242 S. C. 397, 131 S. E. (2d) 257 (1963).

The landowner's argument is based upon the "due process", "equal protection," and "just compensation"

clauses of the State Constitution and the United States Constitution. He had earlier petitioned and been granted by this Court permission to argue against the holdings in *Railway*, *Schrimpf*, and *Sharpe*.

We feel that the reasoning behind the *Railway* and *Schrimpf* cases to which we adhere is determinative here. While some of our condemnation statutes specifically provide for the entry of a judgment and for payment of interest, the statutes under which power companies condemn property do not. As we said in Railway:

" . . . it will not be presumed that the absence of such provision was an oversight which this Court should remedy by reading such into the acts."

And,

"The amount of just compensation to be paid can only be determined under the provisions of an act of the Legislature, by whose authority only procedural legislation may be provided whereby private property may be condemned for public use, together with the means by which just compensation is to be paid for the taking. *City of Spartanburg v. Belk's Department Store of Clinton et al.*, 199 C. C. 458, 20 S. E. (2d) 157."

The final determination of how the condemnor shall exercise its right to acquire thus rests with the legislature. It is within the province of that body to provide for the entry of a judgment and for the payment of interest in cases such as this. It is interesting to note that eight to ten years have elapsed since the *Railway* and *Schrimpf* cases were decided. The legislature has not seen fit during this time to amend the statutes so as to provide for entry of a judgment and payment of interest.

We conclude that there was no authority for the entry of judgment on the verdict, nor for the order that interest should be paid thereon. The trial court allowed interest in error.

A review of the entire record convinces us that the exception challenging the verdict as being the result of passion, caprice and prejudice is without merit.

Reversed and remanded.

Moss, C. J., and Lewis, Bussey and Brailsford, JJ., dissent in part and concur in part.

Brailsford, Justice (concurring in part and dissenting in part):

I agree that a new trial should be granted upon the first ground stated in the opinion of Mr. Justice Littlejohn but respectfully dissent from the conclusion that the second ground, *i. e.,* that the landowner's expert witnesses did not assign before and after values to the entire tract of 179 acres, was error requiring a new trial. These witnesses confined their testimony to the land actually taken for the right-of-way and the land immediately adjacent to it, some twenty-five acres in all. In expressing their opinion as to the amount of compensation to which the landowner was entitled, they found no depreciation in value of the more remote acres. I perceive neither error nor prejudice. This approach to a determination of just compensation dovetails with the opinion's sound pronouncement that, "The measure of just compensation in cases such as this is the value of the land required plus the amount of any 'special damage.' *South Carolina Power Co. v. Baker,* 212 S. C. 358, 46 S. E. (2d) 278 (1948); Code of Laws of South Carolina (1962), §§ 24-12, 58-302, 58-779." The before and after rule is sound but is not exclusive. Furthermore, the trial judge's instructions to the jury that it might use either method in arriving at an award has not been challenged and is the law of this case.

I also dissent from the holding of Justice Littlejohn that interest is not allowable. This question is controlled by the prior decision of this Court in *Haig v. Wateree Power Co.,* 119 S. C. 319, 112 S. E. 55 (1922). Under the *Haig* case, interest may be recovered by the land-

owner where, as here, the taking is by a corporation. The question as to whether the landowner should have been allowed interest "should have been submitted, under appropriate instructions, for the consideration of the jury in fixing damages." *South Carolina State Highway Dept. v. Miller,* 237 S. C. 386, 117 S. E. (2d) 561 (1960).

The right to interest depends upon the facts of the particular case and, as any other element of recovery, must be established by the landowner.

While the form of instructions to the jury on the question of interest cannot be definitely prescribed because of varying factual situations, we suggest reference to the pertinent instruction set forth in the opinion in *South Carolina State Highway Dept. v. Southern Ry. Co.,* 239 S. C. 1, 121 S. E. (2d) 236 (1961).

The soundness of the holding that interest is not allowable in highway condemnation cases is of no concern to the landowner in this case.

Moss, C. J., and Lewis and Bussey, JJ., concur.