688 S.E.2d 136

**NORMANDY CORPORATION, Respondent,**

v.

**SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION, Appellant.**

**No. 4640.**

Court of Appeals of South Carolina.

Heard Oct. 13, 2009.

Decided Dec. 17, 2009.

Rehearing Denied Jan. 20, 2010.

394

Clifford O. Koon, Jr., Paul D. de Holczer, and Robert L. Brown, all of Columbia, for Appellant.

Howell V. Bellamy, Jr., and Robert S. Shelton, both of Myrtle Beach, for Respondent.

GEATHERS, J.

This declaratory judgment action stems from a condemnation action instituted by the South Carolina Department of Transportation (Department) to acquire approximately six acres of land from the Normandy Corporation (Normandy) for the construction of the Carolina Bays Parkway in Horry County. After concluding that the Department was undervaluing the condemned property on the basis that the property was located on a parcel containing wetlands, Normandy sought an order declaring whether any of the wetlands on the parcel fell within the jurisdiction of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (CWA), and the impact, if any, of the CWA on the parcel as of October 13, 2000, the date the condemnation action was filed. The master-in-equity ruled that, as of October 13, 2000, none of the wetlands on the parcel fell within the jurisdiction of the CWA and that the wetlands could legally be drained. The Department now seeks review of the master's order. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

The parcel of property at issue in this case is located in Horry County near the intersection of Highway 9 and Highway 57. It consists of approximately 88.59 acres. Normandy acquired the parcel in 1996 in a bankruptcy proceeding.

In 1997, Loris Hospital expressed some interest in purchasing a portion of the parcel from Normandy. In connection with the proposed sale, Normandy hired Dr. Paul Booth to

perform a wetlands delineation. Dr. Booth delineated seventy-two acres of the parcel and concluded that approximately forty-six of those acres were wetlands. According to Marguerite McClam, a licensed civil engineer who was hired by the Department in connection with the Carolina Bays Parkway project, the United States Army Corps of Engineers (Corps) subsequently "certified" Dr. Booth's delineation and the certification was valid for five years.

At the time that Dr. Booth performed his delineation, Normandy had done nothing significant to the parcel. Ditches around the perimeter of the parcel existed, but they had not been maintained and their flow was blocked by beaver dams.

Ultimately the proposed sale to Loris Hospital was not completed, and, sometime after Dr. Booth's delineation, Normandy cut the timber on the parcel, raked the parcel, "cleared it up," and planted a pine plantation thereon. Additionally, in 1998, Normandy installed Christmas tree ditches on the parcel. Normandy then began the process of having the parcel rezoned from mobile home residential to planned unit development for commercial purposes. A redelineation was not required, and was not performed, in connection with that process, which was completed in April 2000.

On October 13, 2000, the Department filed a Condemnation Notice with respect to Normandy's parcel. According to Normandy's declaratory judgment complaint, the Department sought to acquire approximately six acres of the parcel.[1] The portion of the parcel condemned by the Department provided all of the parcel's frontage and access to Highway 9.[2]

In connection with the condemnation action, the Department retained Gordon Murphy of the LPA Group to prepare a "wetland delineation package request" for the Corps. Murphy visited the site in 2001. Murphy's delineation was limited to the "study corridor," which consisted of 2.7 acres.

Sometime in 2001, the Department submitted an offer to Normandy for the portion of the parcel subject to the condemnation action. The offer was based upon the Department's

---

1. The Condemnation Notice is not included in the record.

2. The condemnation action did not affect the parcel's access to Highway 57.

appraisal, which estimated that 50% to 75% of the parcel was comprised of wetlands. After receiving the Department's appraisal, Normandy asked Norman Boatwright to perform a study to determine the amount of wetlands existing on the parcel. Boatwright's study was completed in 2001.

Normandy subsequently asked Craig Turner to perform a more comprehensive wetlands study. Turner installed eight groundwater monitoring wells across the parcel to document water levels and rates of drainage. The wells were automated to read water levels once daily. Turner's study, which began in December 2003 and lasted until October 2004, found that in addition to the approximately 26 acres that had been delineated uplands by Dr. Booth, another 47.46 acres of the parcel had been converted to uplands as a result of "the drainage system installed in 1998." Thus, Turner's study concluded that roughly 73.5 acres of the 88.59 acres he delineated were uplands (approximately 83%). According to Michael Todd Smith, a partial owner of Normandy, Turner's study was "almost identical" to Boatwright's.

In December 2003, Normandy filed its declaratory judgment action in circuit court. In its complaint, Normandy argued that the Department was undervaluing the condemned portion of the parcel based upon its erroneous assumption that 50% to 75% of the parcel was comprised of wetlands falling within the jurisdiction of the CWA. Specifically, Normandy contended that "the prior accumulation of water" relied upon by the Department in making its appraisal was largely corrected when the parcel was timbered and drainage ditches were installed thereon. Normandy therefore sought a declaration by the court as to whether any wetlands existing on the parcel were jurisdictional (i.e., within the jurisdiction of the CWA) and the impact, if any, of the CWA on the parcel as of October 13, 2000, the condemnation date.

In February 2004, the Department filed a motion to dismiss pursuant to Rule 12(b)(7), SCRCP, seeking dismissal of the declaratory judgment action on the grounds that Normandy had failed to join the South Carolina Department of Health and Environmental Control (DHEC) and the Corps as parties to the action.[3] After conducting a hearing on the matter,

---

3. Rule 12(b)(7), SCRCP, provides that "[e]very defense, in law or fact, to a cause of action in any pleading, whether a claim, counterclaim,

Judge B. Hicks Harwell denied the Department's motion in an order issued October 27, 2004. Judge Harwell concluded that the circuit court did not have jurisdiction over DHEC or the Corps because neither entity had taken any type of final agency action with respect to the parcel. Moreover, with regard to DHEC, Judge Harwell ruled that "[b]asically, the only ability DHEC has to regulate wetlands derives from its review power of a Federal permit application under the CWA."

On January 25, 2006, by mutual agreement of the parties, the declaratory judgment action was stricken from the circuit court's docket with leave to restore pursuant to Rule 40(j), SCRCP. That very same day, the matter was restored and referred to the master pursuant to a Consent Order to Restore and Refer (Order of Reference) issued by the circuit court. A trial was subsequently held before the master on August 27, 2007.

At trial, Normandy introduced the results of Turner's wetlands study. Additionally, Turner, who was qualified as an expert in the fields of soil science and wetland delineation, testified that it was "reasonable and probable" that his study accurately reflected the wetlands status of the parcel as of the condemnation date. He explained that the Christmas tree ditches, which were installed prior to the condemnation date, were "very effective" at pulling water out of wetlands. Turner further testified that the approximately fifteen acres of wetlands remaining on the parcel were not, in his opinion, jurisdictional.

In an order dated November 27, 2007, the master found that Turner's study correctly stated the status of the property as of October 13, 2000. He further held that, as of October 13, 2000, the parcel "contained 73.5 acres of uplands; contained no wetlands within the jurisdiction of the Clean Water Act; and contained 15 acres of wetlands that could be legally drained." The Department subsequently filed a motion to

cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (7) failure to join a party under Rule 19."

alter or amend pursuant to Rule 59(e), SCRCP. The master denied the motion, and this appeal followed.

## ISSUES ON APPEAL

1. Did the master lack subject matter jurisdiction to determine the amount of jurisdictional wetlands existing on the parcel?

2. Did the master err by concluding that the parcel contained no wetlands within the jurisdiction of the CWA?

3. Did the master err by concluding that the parcel contained fifteen acres of wetlands that could legally be drained?

## STANDARD OF REVIEW

 "A suit for declaratory judgment is neither legal nor equitable, but is determined by the nature of the underlying issue." *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund,* 382 S.C. 535, 543, 677 S.E.2d 574, 578 (2009) (quoting *Felts v. Richland County,* 303 S.C. 354, 356, 400 S.E.2d 781, 782 (1991)). Condemnation actions are actions at law. *S.C. Pub. Serv. Auth. v. Arnold,* 287 S.C. 584, 586, 340 S.E.2d 535, 537 (1986). Actions involving the interpretation of statutes, such as the CWA, are also actions at law. *See Auto Owners Ins. Co. v. Rollison,* 378 S.C. 600, 606–07, 663 S.E.2d 484, 487 (2008) ("[B]ecause this action involves the interpretation of a contract and statutes, it is an action at law."); *In re Estate of Timmerman,* 331 S.C. 455, 458–59, 502 S.E.2d 920, 921 (Ct. App.1998) (holding that an action concerning the application of the omitted spouse statute was an action at law). In an action at law tried without a jury, the trial court's findings will not be disturbed on appeal unless they are found to be without evidence reasonably supporting them. *Stanley v. Atlantic Title Ins. Co.,* 377 S.C. 405, 409, 661 S.E.2d 62, 64 (2008).

## LAW/ANALYSIS

### I. Subject Matter Jurisdiction

The Department contends that the master lacked subject matter jurisdiction to issue a ruling as to the amount of

jurisdictional wetlands existing on the parcel as of the condemnation date. We disagree.

■■■■ "Subject matter jurisdiction is the power to hear and determine cases of the general class to which the proceedings in question belong." *Dema v. Tenet Physician Services–Hilton Head, Inc.*, 383 S.C. 115, 120, 678 S.E.2d 430, 433 (2009). The jurisdiction of a court over the subject matter of a proceeding is determined by the Constitution and the laws of the state. *Duckett v. Goforth*, 374 S.C. 446, 456, 649 S.E.2d 72, 77 (Ct.App.2007). Issues involving subject matter jurisdiction may be raised at any time, including on appeal. *Arnal v. Fraser*, 371 S.C. 512, 517 n. 2, 641 S.E.2d 419, 421 n. 2 (2007).

## A. Master's Authority to Issue Ruling

Under the Eminent Domain Procedure Act, S.C.Code Ann. §§ 28–2–10 to 28–2–510 (2007), a circuit court has the power to hear a condemnation action. *See, e.g.*, S.C.Code Ann. § 28–2–30(8) (2007) (defining "court" as "a circuit court of this State"). Additionally, pursuant to the Uniform Declaratory Judgments Act, a circuit court has the authority to preside over a declaratory judgment action. *See* S.C.Code Ann. § 15–53–20 (2005) ("Courts of record within their respective jurisdictions shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed."). Equity courts are considered divisions of the circuit court. S.C.Code Ann. § 14–11–15 (Supp. 2008). The circuit court may, upon application of any party or upon its own motion, "direct a reference" of some or all of the causes of action in a case to a master-in-equity. Rule 53(b), SCRCP. When a reference is made, the master must enter final judgment as to the causes of action referred. S.C.Code Ann. § 14–11–85 (Supp. 2008). Once an action is referred, the master possesses all power and authority that a circuit judge sitting without a jury would have in a similar matter. Rule 53(c), SCRCP.

■■■ Here, the present case is a declaratory judgment action that was commenced in connection with a condemnation action.[4] In its complaint for declaratory judgment, Normandy

---

4. The underlying condemnation action is currently pending in Horry County.

sought a declaration regarding, *inter alia*, "whether the wetlands, if any, are jurisdictional or nonjurisdictional as of the date of the filing of the condemnation action." The Order of Reference did not limit the issues to be addressed by the master; rather, it referred "the case" to him. Moreover, the Order of Reference authorized the master to "take such testimony and make such findings [of] fact and conclusion[s] of law" as he deemed appropriate and to "enter a final judgment."

Based on the foregoing, we conclude that the issue of the amount of jurisdictional wetlands existing on the parcel as of the condemnation date was properly before the master. The issue was plainly pled by Normandy in its declaratory judgment complaint. Additionally, the circuit court, acting within its statutory authority, referred the entire declaratory judgment action to the master without any limitations.

Furthermore, we find that the master was authorized to make a ruling regarding the amount of jurisdictional wetlands existing on the parcel as of the condemnation date. Under South Carolina's Constitution, private property shall not be taken for public use without "just compensation" first being made for the property. S.C. Const. art. I, § 13. For the purpose of fixing just compensation, evidence which is relevant, material and competent may be considered. S.C.Code Ann. § 28–2–340(A) (2007). In addition to the value of the property to be taken, any diminution in the value of the landowner's remaining property and any benefits derived from the proposed project may be taken into account in determining just compensation. S.C.Code Ann. § 28–2–370 (2007).

Also, "[i]t is well settled that compensation is not limited to the value of the property as used by the owner at the time of condemnation." *City of North Charleston v. Claxton*, 315 S.C. 56, 60–61, 431 S.E.2d 610, 613 (Ct.App.1993). "Rather, the owner is entitled to the value of the property under its most advantageous or profitable use, including any use reasonably anticipated in the near future." *Id.* at 61, 431 S.E.2d at 613. Thus, the potential of property may be considered as an element affecting value, so long as the potential is "reasonably probable." *Carolina Power & Light Co. v. Copeland*, 258 S.C. 206, 215, 188 S.E.2d 188, 192 (1972).

Importantly, the value of real property is "commonly limited both by physical factors and by legal or governmentally imposed restrictions." 19 Am.Jur. Proof of Facts 3d 613 § 1 (1993). "Legal or governmentally imposed restrictions include covenants, easements, zoning restrictions, environmental regulations, subdivision ordinances, licenses and permits, floodplain restrictions, coastal and *wetland restrictions,* and other laws, statutes, and ordinances." *Id.* (emphasis added).

Without a doubt, the amount of jurisdictional wetlands existing on a parcel of property can have a considerable impact on the value of that parcel. *See id.* at § 5 (stating that the impact of wetlands on land valuation is "significant").[5] If a wetland is jurisdictional and thus subject to the CWA, then the property owner is required to obtain a permit from the Corps in order to take certain actions, such as placing fill material into the wetland. *See* 33 U.S.C. § 1344(a) (2000). Obtaining a permit from the Corps is no small matter. As Justice Scalia has explained:

> The burden of federal regulation on those who would deposit fill material in locations denominated "waters of the United States" is not trivial. . . . The average applicant for an individual permit spends 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spends 313 days and $28,915—not counting costs of mitigation or design changes. . . . These costs cannot be avoided, because the Clean Water Act "impose[s] criminal liability," as well as steep civil fines, "on a broad range of ordinary industrial and commercial activities."

*Rapanos v. United States,* 547 U.S. 715, 721, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) (internal citations omitted).

Therefore, because the amount of jurisdictional wetlands existing on a tract of land has a significant impact on the value of that tract, evidence regarding jurisdictional wetland amounts is relevant and material to fixing just compensation. Accordingly, we conclude that the master was authorized to make a ruling as to the amount of jurisdictional wetlands

---

5. Although the appraisal is not in the record, in the present case, the Department does not dispute Normandy's claim that the Department appraised the parcel at a lower value based upon its conclusion that 50% to 75% of the parcel consisted of jurisdictional wetlands.

existing on the parcel as of the condemnation date so that the just compensation owed to Normandy could ultimately be determined. *Cf. State v. St. Charles Airline Lands, Inc.*, 871 So.2d 674 (La.Ct.App.2004) (holding that the trial court was allowed to consider, for the purpose of determining just compensation in a condemnation action, expert testimony regarding whether the owner of the condemned property would have received permits to develop wetlands existing on the property).

## B. Corps' Authority to Make Jurisdictional Determinations

The Department, however, argues that because federal law vests the Corps with the authority to determine whether land consists of jurisdictional wetlands, the master lacked subject matter jurisdiction to determine the amount of jurisdictional wetlands existing on the parcel. We disagree.

The Department misconstrues the scope of the master's decision. The master's decision, which was precipitated by a condemnation action, was made for the limited purpose of resolving issues that bore on the value of the condemned property as of the condemnation date. Although the Corps has the authority to make jurisdictional wetlands determinations with respect to issuing permits and approved jurisdictional determinations (JDs) under federal law,[6] the master's decision does not purport to grant a permit or an approved JD to Normandy. Therefore, the master's decision does not improperly infringe upon the jurisdiction of the Corps. To hold otherwise would necessitate the Corps' involvement in every condemnation action in which the amount of jurisdictional wetlands on the condemned property was in dispute.

The Department further contends that an approved JD issued by the Corps with respect to Dr. Booth's 1997 delineation was "the final word" regarding the amount of jurisdictional wetlands existing on the parcel and that Normandy's failure to adhere to the appeals process set forth in

---

6. The term "approved jurisdictional determination" means "a Corps document stating the presence or absence of waters of the United States on a parcel or a written statement and map identifying the limits of waters of the United States on a parcel." 33 C.F.R. § 331.2 (2000).

33 C.F.R. §§ 331.1 to 331.12 precludes it from now utilizing the state court system to "overrule" the Corps determination.

For several reasons, the Department's argument is unpersuasive. First, the Department's argument is at odds with section 28–2–440 of the Eminent Domain Procedure Act, which provides that "*[i]n all condemnation actions*, the date of valuation is the date of the filing of the Condemnation Notice." S.C.Code Ann. § 28–2–440 (2007) (emphasis added). Here, Normandy presented evidence showing that, between the time of Dr. Booth's delineation and the filing of the Condemnation Notice, Normandy installed Christmas tree ditches on the parcel that reduced the amount of wetlands existing thereon.[7] To simply disregard that evidence, as the Department urges, would be inconsistent with section 28–2–440.

Second, the record provided by the Department does not demonstrate what the Corps' conclusions were with regard to the amount of *jurisdictional* wetlands existing on the parcel. The approved JD is not in the record. Moreover, while McClam testified that the Corps "certified" Dr. Booth's delineation, Dr. Booth's delineation is not in the record either. Furthermore, although there is evidence that Dr. Booth determined that approximately forty-six acres of the parcel were wetlands, the record does not indicate how many of those acres he found to be jurisdictional under the CWA. Thus, the Department has failed to meet its burden of providing this Court with a sufficient record upon which to make its decision. *See Helms Realty, Inc. v. Gibson–Wall Co.*, 363 S.C. 334, 339, 611 S.E.2d 485, 487–88 (2005) (appellant has burden of providing sufficient record).

Third, to the extent that the Department is arguing that the doctrine of res judicata or collateral estoppel

---

7. In his order, the master ruled that the ditching was "indisputably legal." Although the Department has challenged that ruling in its reply brief, this Court will not address the issue of the legality of the ditching given that it was not set forth in the statement of issues on appeal in the Department's initial brief. *See* Rule 208(b)(1)(B), SCACR ("Ordinarily, no point will be considered which is not set forth in the statement of the issues on appeal."); *see also Glasscock, Inc. v. U.S. Fid. and Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 692 (Ct.App.2001) (issue cannot be raised for the first time in a reply brief).

barred the master from making a jurisdictional determination as to the parcel's wetlands, the Court notes that "the application of res judicata and collateral estoppel principles are not matters of subject matter jurisdiction." *Mr. T v. Ms. T*, 378 S.C. 127, 133, 662 S.E.2d 413, 416 (Ct.App.2008). Rather, "[t]he defense of preclusion by a former judgment is an affirmative defense which ordinarily must be specially pleaded." *Wagner v. Wagner*, 286 S.C. 489, 491, 335 S.E.2d 246, 247 (Ct.App.1985). Here, the Department did not specifically raise the issue of the preclusive effect of the approved JD, and the master did not rule on the issue. Therefore, the issue cannot be raised on appeal. *See Duckett*, 374 S.C. at 465, 649 S.E.2d at 82 (party cannot raise defense of collateral estoppel for the first time on appeal); *S.C. Dep't of Transp. v. First Carolina Corp. of S.C.*, 372 S.C. 295, 301–02, 641 S.E.2d 903, 907 (2007) (to be preserved for appellate review, issue must have been: (1) raised to and ruled upon by the trial court, (2) raised by the appellant, (3) raised in a timely manner, and (4) raised to the trial court with sufficient specificity).

Finally, the above-referenced federal regulations cited by the Department did not become effective until March 28, 2000. *See* Final Rule Establishing an Administrative Appeal Process for the Regulatory Program of the Corps of Engineers, 65 Fed. Reg. 16486 (March 28, 2000).[8] Moreover, the regulations expressly state that "[a]ffected parties . . . may not appeal approved JDs dated on or before March 28, 2000." 33 C.F.R. § 331.6(e) (2000). Although there is nothing in the record that shows when the Corps certified Dr. Booth's delineation, as noted above, Dr. Booth's delineation was completed in 1997. Thus, it is questionable whether the regulations were in effect at the time that Dr. Booth's delineation was certified.[9]

---

8. Although a previous version of the regulations was in effect prior to March 28, 2000, it did not apply to approved JDs. *See* 33 C.F.R. §§ 331.1 to 331.12 (1999).

9. In fact, even if the regulations were in effect, the preamble to the regulations states that it is the position of the federal government that "jurisdictional determinations are not ripe for [judicial] review until a landowner who disagrees with a JD has gone through the permitting process." Final Rule Establishing an Administrative Appeal Process for the Regulatory Program of the Corps of Engineers, 65 Fed. Reg. at 16488. Additionally, the preamble notes that, because physical circum-

## C. Federal preemption

 The Department also argues that the CWA preempted the master from making a determination regarding the amount of jurisdictional wetlands existing on the parcel as of the condemnation date. We disagree.

 Courts should not lightly infer preemption. *Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 491, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). Federal law may preempt state law in three ways: (1) Congress may expressly define the extent to which it preempts state law; (2) Congress may occupy a field of regulation, "impliedly" preempting state law; or (3) a state law may be preempted to the extent it "conflicts" with federal law. *Prof'l Samplers, Inc. v. S.C. Employment Sec. Comm'n,* 334 S.C. 392, 397, 513 S.E.2d 374, 377 (Ct.App.1999). As to the third method, "conflict arises when either compliance with both laws is impossible or when the state law frustrates the federal purpose and creates an obstacle to the fulfillment of federal objectives." *Id.*

Here, the Department has not pointed to any provision of the CWA that expressly prohibits state courts from making wetlands jurisdictional determinations for the purpose of valuing a property in a condemnation action. Moreover, the Department has not cited, and we have not found, any cases that hold that the CWA "impliedly" precludes state courts from making such determinations. Although courts have held that the CWA preempts state regulation of certain environmental matters,[10] the master's decision does not regulate conduct; rather, it merely rules on the status of the parcel as of the condemnation date. Likewise, while courts have held

stances can change over time, "JDs are not necessarily 'final' even as an administrative matter." *Id.* Based on the foregoing, it seems rather doubtful that the Corps' decision to certify Dr. Booth's delineation constituted a final determination entitled to preclusive effect. *See Zurcher v. Bilton,* 379 S.C. 132, 135, 666 S.E.2d 224, 226 (2008) (issue preclusion applies when an issue has been "actually litigated and determined by a valid and *final* judgment") (emphasis added).

**10.** *See Chasm Hydro, Inc. v. N.Y. State Dep't of Envtl. Conservation,* 58 A.D.3d 1100, 872 N.Y.S.2d 235 (2009) (holding that Federal Power Act and CWA largely preempted the field of regulating hydroelectric facilities).

that the CWA preempts state nuisance law in certain instances,[11] the present case does not involve a nuisance action.

Furthermore, the Department has failed to establish that the master's decision "conflicts" with the CWA. The Department has not contended that compliance with both the master's order and the CWA is impossible. Moreover, the master's decision would not be binding on the Corps in any future permitting matter given that it ruled on the wetlands status of the parcel as of October 13, 2000 (over 9 years ago) and that the Corps was neither a party to the declaratory judgment action nor in privity with any party.[12] Thus, the master's decision does not frustrate a federal purpose or create an obstacle to the fulfillment of federal objectives.

For these reasons, we conclude that the CWA did not preempt the master from making a determination as the amount of jurisdictional wetlands existing on the parcel as of the condemnation date.

## II. Jurisdiction of CWA over Wetlands on Parcel

Next, the Department contends that the master erred by concluding that the parcel consisted of no wetlands within the jurisdiction of the CWA. We disagree.

---

11. *See Ouellette,* 479 U.S. 481, 107 S.Ct. 805 (holding that CWA preempted Vermont nuisance law to extent that Vermont law sought to impose liability on New York point source).

12. "Under the doctrine of collateral estoppel, once a final judgment on the merits has been reached in a prior claim, the relitigation of those issues actually and necessarily litigated and determined in the first suit are precluded as to the parties and their privies in any subsequent action based upon a different claim." *Roberts v. Recovery Bureau, Inc.,* 316 S.C. 492, 495–96, 450 S.E.2d 616, 619 (Ct.App.1994). "The term 'privy,' when applied to a judgment or decree, means one so identified in interest with another that he represents the same legal right." *Id.* at 496, 450 S.E.2d at 619. Here, the Department is a state agency whose "functions and purposes" are the "the systematic planning, construction, maintenance, and operation of the state highway system and the development of a statewide mass transit system that is consistent with the needs and desires of the public." S.C.Code Ann. § 57–1–30(A) (Supp. 2008). The Department's primary concern in this case was to pay a fair price for the parcel. In our opinion, the Department was not in privity with the Corps, a federal agency charged specifically with the duties of environmental regulation under the CWA. *See* 33 U.S.C. §§ 1319(g)(1)(B), 1344 (2000).

Section 404(a) of the CWA regulates the discharge of dredged or fill material into "navigable waters." 33 U.S.C. § 1344(a) (2000). Under the CWA, the term "navigable waters" means "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7) (2000). In its regulations, the Corps has defined the phrase "waters of the United States" to include, among other things, waters susceptible to use in interstate commerce, tributaries thereto, and wetlands that are "adjacent to" such waters and tributaries. *See* 33 C.F.R. § 328.3(a) (2000).

Numerous cases have addressed the meaning of the phrase "waters of the United States" and the validity of the Corps' regulatory definition of that term. The U.S. Supreme Court first tackled these issues in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), a case involving wetlands that abutted a navigable waterway. In that case, the Court upheld the Corps' construction of Section 404 as extending federal jurisdiction to wetlands adjacent to the "waters of the United States." Noting that choosing where "water ends and land begins" was "no easy task," [13] the Court concluded that it was "reasonable for the Corps to interpret the term 'waters' to encompass wetlands adjacent to waters as more conventionally defined." *Id.* at 133, 106 S.Ct. 455. In making its ruling, the Court did not express any opinion on "the question of the authority of the Corps to regulate discharges of fill material into wetlands that are not adjacent to bodies of open water." *Id.* at 131 n. 8, 106 S.Ct. 455.

Since *Riverside Bayview,* the U.S. Supreme Court has issued two major decisions construing the phrase "navigable waters," both of which were decided after the Department filed its Condemnation Notice in October of 2000: *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (*SWANCC*) and *Rapanos v. United States,* 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006).

## A. *SWANCC*

In *SWANCC*, the U.S. Supreme Court considered the issue of whether wholly *intrastate* ponds are subject to federal

---

13. *Id.* at 132, 106 S.Ct. 455.

jurisdiction under Section 404(a) of the CWA based upon the presence of migratory birds. In that case, the owners of the property containing the ponds contacted the Corps to determine if a federal landfill permit under Section 404(a) of the CWA was required for their proposed use of the property as a disposal site for nonhazardous solid waste. Upon being informed that a number of migratory bird species had been observed at the site, the Corps asserted jurisdiction over the site pursuant to 33 C.F.R. § 328.3(a)(3) (1999) and its "Migratory Bird Rule." [14] Although the petitioner made several proposals to mitigate the likely displacement of the migratory birds, the Corps refused to issue a § 404(a) permit. On appeal of the matter, the U.S. Supreme Court concluded that the "Migratory Bird Rule" was not fairly supported by the CWA and that federal jurisdiction did not extend to "nonnavigable, isolated, intrastate waters." *SWANCC*, 531 U.S. at 167, 170–72, 121 S.Ct. 675.

## B. *Rapanos*

*Rapanos* was a consolidation of two Sixth Circuit cases: *Rapanos v. United States* and *Carabell v. United States*. In *Rapanos*, the Supreme Court addressed whether four Michigan wetlands, which were located near ditches or man-made drains that eventually "empt[ied] into" navigable waters, constituted "waters of the United States" within the meaning of the CWA. *Rapanos*, 547 U.S. at 729, 126 S.Ct. 2208. The Court was unable to reach a consensus in the case; the decision was 4–1–4 and included a plurality opinion by Justice Scalia, a concurring opinion by Justice Kennedy, and a dissenting opinion by Justice Stevens. As noted below, because the plurality's opinion and Justice Kennedy's concurrence each set forth a different test for determining CWA jurisdiction, courts interpreting the *Rapanos* decision have disagreed as to how to apply it.

### 1. Plurality's Opinion

The plurality concluded that two findings were required to establish that the wetlands at issue were covered under the

---

**14.** The "Migratory Bird Rule" is set forth in the Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg. 41206, 41217 (November 13, 1986).

CWA. First, it was necessary to find that the channel adjacent to the wetland was a "wate[r] of the United States," which the plurality construed as "a relatively permanent body of water connected to traditional interstate navigable waters." *Rapanos*, 547 U.S. at 742, 126 S.Ct. 2208.[15] According to the plurality, the phrase "waters of the United States" did not include "channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id.* at 739, 126 S.Ct. 2208.

Second, it was essential to find that the wetland had a "continuous surface connection" with the adjacent channel, "making it difficult to determine where the 'water' ends and the 'wetland' begins." *Id.* at 742, 126 S.Ct. 2208. The plurality explained that "[a]n intermittent, physically remote hydrologic connection" would be inadequate to meet this prong of its test. *See id.*

## 2. Justice Kennedy's Concurrence

Justice Kennedy set forth a different test for analyzing whether the wetlands at issue in *Rapanos* fell under the jurisdiction of the CWA. Seizing upon language contained in *SWANCC*,[16] he stated that "the Corps' jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in a traditional sense." *Id.* at 779, 126 S.Ct. 2208. He further explained that:

> [W]etlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstan-

---

**15.** As the plurality noted, the traditional definition of the term "navigable waters" required that the waters be navigable in fact or capable of being rendered so. *Rapanos*, 547 U.S. at 730, 126 S.Ct. 2208 (citing *The Daniel Ball*, 77 U.S. 557, 10 Wall. 557, 563, 19 L.Ed. 999 (1870)).

**16.** In *SWANCC*, the Court explained its decision in *Riverside Bayview* by stating that "[i]t was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the CWA in *Riverside Bayview Homes*." *SWANCC*, 531 U.S. at 167, 121 S.Ct. 675.

tial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

*Id.* at 780, 126 S.Ct. 2208.

There has been disagreement among courts as to how to apply the fragmented *Rapanos* decision. *Compare N. Cal. River Watch v. City of Healdsburg,* 496 F.3d 993, 999–1000 (9th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1225, 170 L.Ed.2d 61 (2008) (holding that Justice Kennedy's test provides the controlling rule for determining jurisdiction) with *U.S. v. Johnson,* 467 F.3d 56, 60–66 (1st Cir.2006), *cert denied,* 552 U.S. 948, 128 S.Ct. 375, 169 L.Ed.2d 260 (2007) (holding that jurisdiction exists if either the plurality's test or Kennedy's test is met). In the present case, it is unnecessary for us to take a position on this issue because we conclude that, under either the plurality's test or Justice Kennedy's test, the wetlands on the parcel are nonjurisdictional.

## C. Evidence Presented at Trial

### 1. Normandy

At trial, Normandy introduced the results of Turner's study, which found that roughly fifteen acres of the 88.59–acre parcel consisted of wetlands (approximately 17%). The study also concluded that those fifteen acres of wetlands could be converted to uplands through the installation of additional ditching. Although Turner did not begin his study until 2003, he testified that it was "reasonable and probable" that his study accurately reflected the wetlands status of the parcel as of October 13, 2000, the condemnation date. Turner's testimony was buttressed by that of Normandy's owner, Smith, who testified that the findings in Turner's study were "almost identical" to those contained in the study conducted by Boatwright in 2001.

As to whether the wetlands on the parcel were jurisdictional, Turner testified that, in his opinion, none of the wetlands were jurisdictional. As support for his opinion, Turner testified that the closest traditional navigable water to the parcel was the Waccamaw River, which he estimated was five to six miles away. He also testified that the Christmas tree ditches installed on the parcel "dry up quite radically" and that, even in abnormally heavy periods of rainfall, they did not have

significant flow for a continuous three-month period but rather were "bone dry." Finally, Turner testified that, in his opinion, neither any of the ditches nor any of the areas that still met the wetlands criteria had a significant nexus with a traditional navigable water.

## 2. The Department

The Department relied primarily upon the testimony of McClam, who was qualified as an expert in civil engineering and hydrology. In contrast to the evidence presented by Normandy, McClam testified that approximately 56% of the parcel was wetlands. However, she acknowledged that her opinion was based upon Murphy's delineation, which covered only 2.7 acres of the parcel, and Dr. Booth's delineation, which was conducted before Normandy installed the Christmas tree ditches. Moreover, on cross-examination, McClam admitted that she did not personally conduct any tests on the parcel, and that, while others working on the Carolina Bays Parkway project did do some soil borings, their work was limited to the study corridor.

McClam also testified that it was her opinion that the wetlands portion of the parcel was jurisdictional "based upon its connection to canals and tributaries." However, McClam never specifically testified that the wetlands on the parcel had a "continuous surface connection" with any of the canals or tributaries she mentioned. Nor did McClam expressly testify that a "significant nexus" existed between the wetlands on the parcel and a traditional navigable water. Furthermore, while McClam testified that she visited the parcel, she did not testify that she inspected the entire parcel, even when asked by Normandy's counsel.

McClam further testified that "the nearest water course" to the parcel was Bellamy Branch and that Bellamy Branch ultimately led to the Waccamaw River. However, McClam failed to provide specific testimony as to the proximity of Bellamy Branch to the parcel.

## D. Analysis

Where an expert's testimony is based upon facts sufficient to form the basis for an opinion, the trier of fact determines its probative value. *Small v. Pioneer Machinery,*

*Inc.*, 329 S.C. 448, 470, 494 S.E.2d 835, 846 (Ct.App.1997). "This Court cannot judge the credibility or weight of the testimony on appeal." *Id.*

Here, the evidence in the record adequately supports the master's conclusion that, as of October 13, 2000, the parcel contained no wetlands within the jurisdiction of the CWA. Turner's testimony demonstrated that the wetlands did not have a "continuous surface connection" with any "relatively permanent" body of water and that the *Rapanos* plurality's test for jurisdiction was therefore not met. Turner's testimony also showed that there was not a significant nexus between the wetlands and a traditional navigable water and that Justice Kennedy's jurisdictional test was not met either. Although McClam's testimony contradicted some of the testimony presented by Turner, she did not investigate the parcel as thoroughly as Turner did. Therefore, it was reasonable for the master to rely on Turner's testimony rather than McClam's.

The Department nonetheless contends that Turner's testimony failed to sufficiently establish that the wetlands were nonjurisdictional. Specifically, the Department points to Turner's testimony during cross-examination in which Turner admitted that he did not know whether a certain canal on the parcel connected to the Waccamaw River. The Department claims that this information was crucial to determining whether the wetlands were covered under the CWA.

However, there is no clear evidence in the truncated record that the canal in question had any connection to the wetlands portion of the parcel.[17] Indeed, if anything, the record appears to show that the canal was not connected to the parcel's wetlands. For instance, during direct examination, Turner testified that there was a canal located in the uplands area of the parcel. He also testified that the only ditch on the parcel that kept a substantial nexus with the canal was a ditch coming off the Carolina Bays Parkway (Highway 31) into which the Department had placed water from the Parkway. Turner further testified that none of the areas that still met the wetland criteria were adjacent to that ditch. Thus, even if

---

**17.** Among many other pages, the first few pages of Turner's cross-examination are missing from the trial transcript. As a result, the Court is unable to determine the precise location of the canal.

the canal could be construed as a tributary to the Waccamaw River, Turner's testimony seems to support the conclusion that the canal did not have any sort of connection or nexus to the wetlands on the parcel.

The Department also contends that Turner acknowledged that, on the date of condemnation, the parcel's wetlands *may* have been connected to tidal waters downstream.[18] Specifically, the Department points to the following exchange between Normandy's counsel and Turner:

Q: And based on that, are any of the areas that still meet the wetland criteria shown on Exhibit 4, in your expert opinion, under the jurisdiction of the federal government?
A: No sir, they're not because I don't believe that any of these have a significant nexus to the tidal waters downstream, so none of them, these areas may meet the criteria right now. *They may have met the criteria on the date of the take,* but the way the law, case law reads now, you can argue that none of these wetlands have a significant nexus, and are therefore non-jurisdictional.

We disagree with the Department's interpretation of this testimony. In our view, Turner was not conceding that the wetlands may have been connected to tidal waters downstream on the condemnation date. Rather, he was simply acknowledging that, *under the case law that existed on the condemnation date,* the wetlands might have been considered jurisdictional.[19] Importantly, the Department does not contend that *SWANCC* and *Rapanos,* both of which were issued after the condemnation date, are inapplicable to this case.

## III. Legality of Wetlands Drainage

■ Finally, the Department contends that the master erred by concluding that, as of the condemnation date, the

---

18. The Corps' regulatory definition of "waters of the United States" expressly includes "waters which are subject to the ebb and flow of the tide." *See* 33 C.F.R. § 328.3(a)(1) (2000).

19. For instance, prior to *SWANCC,* the Corps relied upon the mere presence of migratory birds to establish federal jurisdiction over wetlands. Moreover, as noted by Justice Scalia in *Rapanos,* even after *SWANCC,* courts continued to uphold broad assertions of jurisdiction by the Corps. *See Rapanos,* 547 U.S. at 726–727, 126 S.Ct. 2208 and the cases cited therein.

parcel contained fifteen acres of wetlands that could legally be drained. Specifically, the Department argues that even if the parcel is not subject to regulation under the CWA, it is subject to state regulation by the Office of Ocean and Coastal Resource Management (OCRM) as an isolated wetland.

We find no reversible error here. In his order, the master held that the issue of "DHEC's alleged jurisdiction" over the wetlands was no longer before the court because it had previously been decided by Judge Harwell in his October 2004 order. The Department has not challenged the master's ruling. Therefore, it is the law of the case, regardless of its correctness. *See Buckner v. Preferred Mut. Ins. Co.*, 255 S.C. 159, 160–61, 177 S.E.2d 544, 544 (1970) (holding that an unappealed ruling, right or wrong, is the law of the case). Accordingly, because OCRM is a part of DHEC,[20] we conclude that the master did not err by failing to consider whether the parcel is subject to state regulation by OCRM as an isolated wetland.

## CONCLUSION

For the foregoing reasons, the master's decision is

**AFFIRMED.**

SHORT, J., and WILLIAMS, J., concur.

---

**20.** *See, e.g.,* S.C.Code Ann. §§ 48–40–20(2), 48–40–40(B) (2008).